**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **3:16-CR-255** |
| | : | **(JUDGE MARIANI)** |
| **CHAY WRIGHT,** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

**I. INTRODUCTION AND PROCEDURAL HISTORY**

On September 6, 2016, a federal grand jury indicted Defendant Chay Wright on one count of possession with intent to distribute heroin, "bk-MDMA (ethylone), a derivative of 2-aminopropan-1-one", cocaine, and cocaine base ("crack") in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). (Doc. 1).

On August 24, 2020, Defendant filed a Motion to Suppress Seizure of Defendant (Doc. 76), Motion to Suppress Search of Residence (Doc. 78), and Motion to Dismiss Indictment for Vagueness (Doc. 82). The Court then scheduled a suppression hearing and oral argument for November 17, 2020 which was continued at the parties' request to November 25, 2020 (Docs. 91, 93, 94). At the hearing, the Government presented three law enforcement witnesses: Wilkes-Barre Police Officer Jeffrey Ference, Hanover Township Police Department Officer Mark Stefanowicz and Hanover Township Police Department

Patrolman Richard Andress.  The Defendant presented the testimony of Juanita Avent.[1]

At the close of the hearing, the parties requested the opportunity to file post-hearing briefs and they have now done so (Docs. 99, 100).  As a result, the motions are ripe for resolution.

The Court addresses in this Memorandum Opinion both of Defendant's motions to suppress (Docs. 76, 78).  For the reasons set forth herein, the Court will deny the Motion to Suppress Seizure of Defendant (Doc. 76) and will deny in part and grant in part the Motion to Suppress Search of Residence (Doc. 78).

## II. ANALYSIS

### A. Motion to Suppress Seizure of Defendant (Doc. 76)

Defendant Chay Wright's Motion to Suppress Seizure of Defendant (Doc. 76) asserts that the Indictment in this case arises out of an unlawful seizure of Wright by Wilkes-Barre Police Department Officer Jeffrey Ference. (Doc. 76, ¶ 4).  Defendant Wright further contends that "[d]uring the unlawful seizure, Officer Ference discovered controlled substances on the person of Mr. Wright and the fruits of that unlawful search included evidence found within his residence on the same date and statements alleged to have been made later by Mr. Wright."  (*Id.* at ¶ 5).

---

[1] The testimony presented at the hearing addressed only the Defendant's motions to suppress. Despite being afforded the opportunity to do so, Defendant did not offer any testimony in support of his motion to dismiss, nor did counsel present any oral argument.  (*See* Hr'g Tr., at 123)(counsel for Defendant acknowledging that "the original order [scheduling the hearing] mentioned the motion to dismiss on vagueness, but I don't see any reason to provide additional argument.  I think that was covered adequately in the brief by defendant.").

At the evidentiary hearing, Wilkes-Barre Police Officer Jeffrey Ference testified that on October 6, 2015, he travelled while on duty to 496 South Main Street in Wilkes-Barre, Pennsylvania. (Hr'g Tr., at 5:5-14). Ference testified that he was "following up an investigation as to a rented vehicle at an auto sales or repair shop" located at that address. (*Id.* at 5:11-14). He stated he was dressed that day in a "polo and a pair of, like, khaki pants or we call 511 pants with pockets. I would have had a firearm on my side and a badge tucked in my belt along with a radio." (*Id.* at 5:15-19). He testified that he arrived at the repair shop "[a]round 10, 10:15." (*Id.* at 5:20-22).

Ference described the investigation he was conducting as "about either a rented or a sold vehicle that didn't have proper title documentation. I was going there to speak with the owner to see if they can give me more information on the vehicle as to who had rented it, if it was sold, et cetera." (*Id.* at 7:19-23). He drove to 496 South Main Street in an "undercover type vehicle" and parked in the parking lot of the business "to the side where there was open spots. The front of the business was filled with vehicles that were parked there already." (*Id.* at 8:11-18).

Ference then described what initially happened following his arrival at 496 South Main Street:

> I had arrived there, knocked on the front business door. There was obviously no one there. The office area and the garage area was in darkness. I didn't see any employees or any signs of it being open. As I waited there, a vehicle, a green pickup truck, pulled into the lot and backed in between two stationary vehicles.

(Hr'g Tr., at 9:4-9).

After the green pickup truck pulled into the lot and backed into a "spot", Ference

described what he did next:

> By the way he came in at the time I thought it was an employee or owner,
> someone I can talk to about the -- my investigation.   So I walked over and
> engaged the driver in conversation if he was a worker, an owner, et cetera.

(*Id.* at 9:20-23).  Ference testified that when he approached the vehicle, the vehicle's driver

side window was down.  (*Id.* at 9:24-25; 10:1-2).  He then described his interaction with the

driver, Defendant Wright:

> I walked between the stationary vehicles and spoke to the driver of the vehicle,
> which was Mr. Chay Wright.  I asked him if he was an owner or an employee
> of the Extreme Auto Works.  He said no.  I asked if he knew any of the
> employees or owner of the -- of Extreme Auto Works.  He again said no.

(*Id.* at 10:4-8).

When asked why he was asking "those type questions", Ference responded:

> A.     I wanted to talk to someone about my investigation.  I thought he was a
>        worker or a -- or an employee.
>
> Q.     You thought he potentially was associated with the business?
>
> A.     Yes.

(*Id.* at 10:9-15).

Ference then repeated his testimony that he asked Wright whether he was the

owner or a worker at the Extreme Auto Works business to which Defendant responded

"no".[2]  Ference further testified that he asked Wright whether he knew anyone at Extreme

Auto Works, and that the Defendant answered "I don't know" and that he was "waiting for

someone." (*Id.* at 10:16-21).

Ference then testified as follows:

Q.      . . . Up to this point, was there anything unusual about your interaction
        with Mr. Wright?

A.      Not until that point.  Then after that it became slightly unusual.

(Hr'g Tr., at 10:22-25).  When asked what happened next, Ference stated:

A.      After he said -- he doesn't know, he was waiting for someone, he just
        started looking all over the place, down on the floor, et cetera, not
        continuing engaging or anything like that or speaking.

Q.      And where were you standing at this point?

A.      Right next to the door, right next to the window of the -- of his vehicle.

Q.      So you're talking to him through the driver's side window?

A.      Correct.

Q.      What was your next question to him at that point?

A.      My next question, I asked -- I identified myself as a Wilkes-Barre City
        police officer.  I had a badge on my belt, my identification.  I asked him
        his reason for being there.
        . . . .

Q.      Okay.  And did he reply to that?

A.      It wasn't an instantaneous reply.  The reply was delayed around 15 to

---

[2] The auto repair shop is referred to as both "Extreme Auto Works" and "Xtreme Auto Works".  For
purposes of clarity and consistency, the Court will refer to the business as "Extreme Auto Works".

20 seconds.  He didn't respond to me.

Q.     So after 15 or 20 seconds, did he say anything at that point?

A.     Basically when I said if he had any reason to be there or if he had identification, he said he didn't have any and he would like to call his wife.

Q.     Up to this point have you observed any cell phones or any – anything in his possession?

A.     There was a cell phone on his lap that was constantly ringing.

Q.     After he indicated to you that he's going to call his wife what happened at that point?

A.     He said he was going to call his wife, and instead of using the working cell phone that was on his lap, he began to dig into the folds or the voids in the seats of the vehicle.
       . . .

Q.     And so when he started reaching for the phone, did you say anything at that point?

A.     I asked him to stop and exit the vehicle.

Q      And why did you do that?

A.     He had a clear working cell phone there to do what he had asked to contact his wife.  Things weren't – his delays in his response, his looking around, et cetera, that led me to believe there was something more.  I didn't know why he was going into the folds of the seat. So he was asked to step out for my safety and officer's safety.

Q.     I think you indicated that when he was reaching you asked him to show his hands; is that correct?

A.     Yes, I did, yes.

(*Id.* at 11:2-25; 12:1-25) (*see also, id.* 26:12-25; 27:1-4 (testifying on cross-examination that

after his initial questioning of Wright as to whether he knew when the owner or an employee of the auto repair shop would arrive and Wright responding that he did not know and that he was waiting for someone and then began looking around in different directions, Ference identified himself as a police officer)).  Ference testified that he asked Wright to show his hands and to step out of the vehicle.  (*Id.* at 13:1-2).  He also testified that he had called officers to assist him on the second occasion when he asked Wright for his reasons for being at the vehicle repair shop.  (*Id.* at 13:3-6).

Wright was asked to step out of the vehicle and did so.  Ference testified that he then "did a quick check of the waistband area where people commonly have or hold weapons.  There was a blue handled pocket knife clipped to his left-hand pocket."  (*Id.* at 14:5-10).  Additionally, Ference testified that Defendant was asked to step to the front of the vehicle because of the "tight area of the space between the vehicles".  Ference described his actions, stating "so it was a quick pat for weapons. Nothing more was done there."  (*Id.* at 14:17-18).  He testified that it was approximately two minutes from the time of his initial interaction with Wright to the time that he asked him to exit the vehicle.  (*Id.* at 14:19-23).

Ference testified he did not block Wright's vehicle in any way, adding that his own vehicle "was parked off to the side" and that he "wasn't in front of his vehicle or in any way in front or inhibiting his vehicle from moving."  (Hr'g Tr., at 14:24-25; 15:1-6).

Ference further testified that once Wright was in front of his vehicle, Ference advised him that "he was under official investigation for reasons of him being there.  He was asked

for his identification again, name, date of birth, and he reluctantly replied and gave his

name, Chay Wright, and date of birth." (*Id.* at 15:9-15).

Ference sent that information to the 911 center to check for license status and

warrants. While waiting for that information from the 911 center, Ference testified that he

and the other officers were waiting with Wright. (*Id.* at 15:16-22). Ference testified that

Wright was in front of his vehicle and seemed "extremely nervous." Ference explained:

> Mr. Wright seemed to be swaying back and forth, sweat coming off his
> forehead, and eventually Mr. Wright put his hands in his front pocket. He was
> wearing, like, a sweatshirt, like, I would call it the kangaroo pouch in the front,
> big pockets – eventually put his hands in his pocket and pulled his hands out.

(*Id.* at 15:23-25; 16:1-4).

According to Ference, when Wright put his hands in his pocket and then pulled his

hands out, Ference noticed that there was a "visible baggie that looks like he mistakenly

pulled out or got caught on his hands, and in that clear baggie was visible marijuana." (*Id.*

at 16:5-8).

Ference testified that Wright was then taken into custody for possession of the

marijuana. Ference explained:

> Q.    And after he was taken into custody, did you do a more thorough search
>       of his person?
>
> A.    Yes, we did. After he was taken into custody, this would be search
>       incident to arrest. So we had to search Mr. Wright's pockets, pants, et
>       cetera. During that time we discovered a quantity of crack cocaine,
>       approximately 29 grams separated into denominations or baggies which
>       would, say, packaged for sale different sizes of crack cocaine which
>       would sell for different – different amounts of money. I believe there

was 17 different packages total.

(*Id.* at 16:11-22).

On cross-examination, Ference repeated his direct testimony as to the sequence of events that led to Defendant Wright's arrest.  He confirmed that the correct sequence of statements in his initial encounter with Wright was that he "asked the driver [Wright] if he was an owner or employee of the business" and then asked if Wright "knew when the owner or employees would be arriving."  (*Id.* at 22:17-21).

Ference also testified that when he first saw the pickup truck, he could not see the "complexion of the skin of the driver of the vehicle."  (Hr'g Tr., at 22:22-25; 23:1).

Ference stated that he carried a department issued firearm and he agreed that the firearm was "something that somebody would see that you were carrying as you walked over."  (*Id.* at 23:7; 23:12-14.)  Ference also had a badge and radio on his belt.  (*Id.* at 23:15-25).

Ference testified that, at the time of his initial questioning of Wright as to whether he knew when the owner or an employee of the business would be arriving, he had not observed any criminal activity from Wright and that there was no odor of drugs.  (*Id.* at 26:3-11).

When questioned further on cross-examination as to what Defendant said when asked his reason for being at the auto repair shop, Ference, in referring to his testimony at the preliminary hearing, testified as follows:

> Q.      . . . In describing Mr. Wright's response previously when you testified at
>         line 8, you described his response with the words, I don't have any

> reason to be here, let me call my wife.  Isn't that what Mr. Wright said
> that day, I don't have any reason to be there?

A.    In my report I asked the male for identification and again for his reasoning for being on the property.  I asked him a two-part question as he was there.  I testified that he stated, I don't have any reason to be here, let me call my wife.

Q.    So you asked him a two-part question?

A.    Correct.

Q.    He provided you an answer to one of those parts that was, I don't have a reason to be here, correct?  When he says, I don't have any, he's referring to his reason to be there, not to his identification; isn't that correct?

A.    I think you can construe both.

Q.    Excuse me?

A.    He doesn't have any reason to be there.  That's what he said.

(*Id.* at 31:12-25; 32:1-5).

Ference further testified on cross-examination that when he asked Wright to exit the vehicle and patted him down, he told Wright that he was part of an official investigation for what Ference believed was trespassing.  (*Id.* at 33:18-25; 34:1-5).

Ference also repeated his testimony that when Wright pulled his hands from the front pocket of his hooded sweatshirt, he noticed the bag of marijuana and it was at that point that Wright was placed under arrest and searched which resulted in the discovery of the other drugs found on Wright's person.  (Hr'g Tr., at 35:6-11).

On redirect examination, Ference repeated his testimony that Wright was able to get

10

out of his vehicle; that there was enough room for him to get out and for Ference to be there

at same time as well as sufficient room for Ference to do a pat down search of Wright once

he was out of his vehicle.  (*Id.* at 39:2-15.)

Further, Ference testified that with respect to the "two-part question", *i.e.*, his

question as to whether Wright had identification and what his reason was for being on the

property:

> Q.    . . . So although he may have answered in regards to the reason for
> being there, he did not provide you with identification at that point, did
> he?
>
> A.    Not at that point, no.
>
> Q.    And, in fact, when you searched him pursuant to the arrest that you
> made, were you able to find either an I.D. or Pennsylvania or any type
> of driver's license on his person?
>
> A.    I don't recall us finding identification, I.D., on his person.

(*Id.* at 41:8-15).

Ference also testified on redirect examination as to the multiple cell phones found in

the vehicle when it was searched after Wright's arrest:

> Q.    One final question.  You indicated on cross-examination that you found
> multiple cell phones in the vehicle when you did a more thorough search
> of the vehicle after Mr. Wright's arrest; is that correct?
>
> A.    Correct.
>
> Q.    And in your training and experience as a narcotics officer having
> multiple cell phones, is that something that is indicative of or is not
> unusual for a person who is involved in narcotics distribution?

> A.    It's not unusual. Usually there would be a business phone and personal phone.
>
> Q.    When you say business phone, what do you mean by that?
>
> A.    One they would specifically conduct drug transactions with.

(*Id.* at 41:17-25; 42:1-5).

Officer Ference was the only witness presented by the Government at the evidentiary hearing on November 25, 2020, who was present during the events at issue at Extreme Auto Works on October 6, 2015.  Defendant did not present any witness testimony in support of his motion to suppress the "seizure of [Defendant] and all fruits thereof."  (Doc. 77, at 7).[3]

In the pending motion "to suppress seizure of Defendant", Wright moves to suppress evidence on the basis that the "initial seizure of defendant and his vehicle by the police officer [was] unlawful as it was not based upon reasonable suspicion to suspect a violation of the law."  (Doc. 77, at 3). Defendant asserts that "Mr. Wright was held without particularized and reasonable suspicion to suspect that crime was afoot.  As a result, a baggie of suspected marijuana was observed."  (*Id.* at 4).  Defendant thus seeks to "suppress the seizure of his person and all fruits thereof, including the alleged observations of marijuana in his pocket, the controlled substances found in the search incident to arrest,

---

[3] Defendant presented the testimony of Wright's girlfriend, Juanita Avent, who briefly testified as to where she believed Wright had been the morning of October 6, 2015.  However, Avent was not present at Extreme Auto Works prior to, or at the time of, Defendant's arrest and she had no personal knowledge of the events at issue in this motion to suppress. (*See generally*, Hr'g Tr., at 83-91).  Avent's testimony related primarily, if not exclusively, to the Defendant's Motion to Suppress Search of Residence (Doc. 78).

the controlled substances found in the subsequent search of his house and any statements

during the course of the unlawful arrest." (*Id.* at 7). In his post-hearing brief, Defendant

argues that "Officer Ference detained Mr. Wright without particularized reasonable

suspicion that he had committed any offense," (Doc. 99, at 9)(citing *United States v. Brown*,

448 F.3d 239, 246 (3d Cir. 2006)) and that "Officer Ference's conclusion that he had

reasonable suspicion to detain Mr. Wright are [*sic*] not supported by the record", (*id.*).

Defendant also asserts that "Officer Ference conducted a pat down search without specific

facts pointing to Mr. Wright being armed and dangerous or possessing drugs." (*Id.*).

> The Fourth Amendment guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ... and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (West 2002). As stated in *United States v. Butler*,

> [t]his provision limits government action in two related ways. First, it requires that the government conduct only reasonable searches and seizures. Second, it sets out (albeit at a high level of generality) the prerequisites that government officials must complete before executing a search or seizure, which include obtaining a warrant. "The Supreme Court has read the Amendment's twin commands in tandem, holding that when people have a reasonable expectation of privacy in their persons or effects, all searches and seizures must be supported by a warrant, unless they fall into one of the exceptions to that requirement." *United States v. Hartwell,* 436 F.3d 174, 177 (3d Cir. 2006) (citing *Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

*United States v. Butler*, 405 F.App'x 652, 655 (3d Cir. 2010). "What is reasonable depends

upon all of the circumstances surrounding the search or seizure and the nature of the search

or seizure itself." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985).

As recently explained by the United States Supreme Court in *Kansas v. Glover*, 140

S. Ct. 1183 (2020):

> [u]nder this Court's precedents, the Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); see also *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014) (quotation altered); *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).
>
> Because it is a "less demanding" standard, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The standard "depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act." *Navarette*, *supra*, at 402, 134 S.Ct. 1683 (quoting *Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (emphasis added; internal quotation marks omitted)). Courts "cannot reasonably demand scientific certainty ... where none exists." *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." *Ibid.*; see also *Navarette*, *supra*, at 403, 134 S.Ct. 1683 (noting that an officer " 'need not rule out the possibility of innocent conduct' ").

*Kansas*, 140 S. Ct. at 1187-88.  Stating that the Supreme Court "precedents . . . repeatedly

affirmed that the ultimate touchstone of the Fourth Amendment is reasonableness," the

Court emphasized that "[t]he standard takes into account the totality of the circumstances—the whole picture." *Id.* at 1191 (internal quotations and citations omitted). In *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002), the Court of Appeals for the Third Circuit noted that

> [t]he Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences . . . , personal observation of suspicious behavior . . . , information from sources that have proven to be reliable, and information from sources that—while unknown to the police—prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip.

284 F.3d at 478.

Under the exclusionary rule "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra,* 414 U.S. 338, 347 (1974). This prohibition also applies "to the fruits of the illegally seized evidence." *Id.* The rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at 348; *United States v. Leon,* 468 U.S. 897, 906 (1984).

In the present case, the events of October 6, 2015 may be analytically viewed as an interaction that initially began when Officer Ference travelled to 496 South Main Street in Wilkes-Barre to a business called Extreme Auto Works with the intention of speaking with the owner of that business in connection with an investigation he was conducting "about a rented or sold vehicle that didn't have proper title documentation." (Hr'g Tr., at 7:17-23).

Officer Ference testified that when he arrived at that location, he knocked on the front business door.  He stated "[t]here was obviously no one there.  The office area and the garage area was in darkness."  (*Id.* at 9:4-7). He then testified that as he waited there, "a vehicle, a green pickup truck, pulled in to the lot and backed in between two stationary vehicles." (*Id.* at 9:8-9).  Ference testified that he walked over and engaged the driver in conversation while the driver sat in the vehicle with the window down.  (*Id.* at 9:22-25; 10:1-2).  He asked the driver of the vehicle, Chay Wright, if he was an owner or an employee of the Extreme Auto Works business.  Wright responded "no."  He further asked if Wright knew of any of the employees or owners of Extreme Auto Works and again Wright answered "no." (*Id.* at 10:4-9).  Ference testified that he asked those questions because he wanted to speak with someone about his investigation and thought that the Defendant might be associated with the business.  Ference then asked Wright whether he knew anyone – owner or employee– at Extreme Body Works and that Defendant responded that he did not and that he was "waiting for someone."

As of this point in time, all of Officer Ference's actions and questions were proper and no seizure had taken place.  This conclusion is fully supported by the decision in *United States v. Williams*, 413 F.3d 347 (3d Cir. 2005).  There police officers came upon a parked van with its rear doors open, revealing the defendant inside bagging marijuana.  The Court held that the District Court erred when it held that the police lacked reasonable suspicion to approach the van and question its occupants.

The defendant in *Williams* argued that "the police's approach constituted a seizure because he had a heightened expectation of privacy in the van." 413 F.3d at 353. The Court found this argument to be without merit stating

> The fact that Williams was seated within the van, rather than standing on the street, is irrelevant in this matter. It is well-established that police officers who lack reasonable suspicion may approach and question people seated in vehicles in public places. *See, e.g., Johnson*, 332 F.3d at 206 (holding that police officers did not "stop" defendant sitting in car until a few seconds into the encounter when it became clear that defendant was not free to go); *United States v. Hendricks*, 319 F.3d 993, 999 (7th Cir.2003) (finding no seizure where officer approached a vehicle parked at gas station); *see also* 4 Wayne R. LaFave, Search and Seizure § 9.3(a), at 96-97 (3d ed. 1996) ("[I]f an officer merely walks up to a person standing or sitting in a public place (or, indeed who is seated in a vehicle located in a public place) and puts a question to him, this alone does not constitute a seizure."). Here, the van was parked in a public place with the rear doors open. The police could approach the parked van without any reasonable suspicion, just as they could approach an individual standing on the street without any reasonable suspicion. Merely approaching an individual, whether standing or in an automobile, does not constitute a seizure under the Fourth Amendment.

*Id.* at 353-354.

The encounter between Officer Ference and Defendant Wright then continued. Ference testified that Defendant responded that he was waiting for someone and that he "just started looking all over the place, down on the floor, et cetera, not continuing engaging or anything like that or speaking." (Hr'g Tr., at 11:2-5). Ference identified himself as a Wilkes-Barre City police officer and asked the Defendant "his reason for being there." (*Id.* at 11:11-16.) Ference testified that Wright's reply was not instantaneous, but delayed for 15 to 20 seconds during which Wright did not respond.

When Wright did respond to the question whether he had any reason to be on the premises at 496 South Main Street or if he had identification, he stated he did not have any and would like to call his wife.  During this time, Ference observed a cell phone in Defendant's lap that was "constantly ringing." (*Id.* at 12:2-3). After indicating to Ference that he was going to call his wife, Wright, as testified to by Ference, "instead of using the working cell phone that was on his lap, he began to dig into the folds or the voids in the seats of the vehicle."  (*Id.* at 12:6-8).  It was at that point that Officer Ference asked Wright to "stop and exit the vehicle."  When he was asked why he did that, he testified:

> He had a clear working cell phone there to do what he had asked to contact his wife.  Things weren't – his delays in his response, his looking around, et cetera, that led me to believe there was something more.  I didn't know why he was going into the folds of his seat. So he was asked to step out for my safety and officer's safety.[4]

(Hr'g Tr., at 13:17-22).  When Ference asked Wright to get out of his vehicle, back up officers had arrived.  (*Id.* at 13:25; 14:1-3.)

Wright exited the vehicle and Ference testified he did a "quick check of the waistband area where people commonly have or hold weapons.  There was a blue handled pocket knife clipped to his left-hand pocket."  Ference described what he did as a "quick pat down for weapons."  (*Id.* at 14:5-18).

Ference testified that after Wright exited the vehicle at Ference's request, "we

---

[4] Ference testified that he had called officers to assist him "the second time when I asked about his [Wright] reason for being there."  (Hr'g Tr., at 13:4-6).

advised him that he was under official investigation for reasons of him being there.  He was asked for his identification again, name, date of birth and he reluctantly replied and gave his name, Chay Wright, and date of birth." (*Id.* at 15:11-15.)

The Government argues that "[w]hether investigating trespass, or failure to possess a valid driver's license in violation of Pennsylvania's vehicle code, or both, there is sufficient objective facts to justify the brief investigatory detention of Wright.  Such detention is best measured from the time Wright was requested to exit his vehicle as before that time he was free to drive away from the mere encounter with Officer Ference." (Doc. 100, at 12).  The Court agrees with this statement.  Thus, the question is whether this brief investigative stop was supported by a "particularized and objective basis for suspecting the particular person stopped of criminal activity," *Kansas,* 140 S. Ct. at 1187.  Here, the facts establish that Ference had reasonable suspicion to engage in a brief investigatory stop and frisk of Defendant.

"We evaluate the totality of the circumstances in considering 'whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying the detention.'" *United States v. McCants*, 952 F.3d 416, 422 (3d Cir. 2020) (quoting *United States v. Brown*, 448 F.3d 239, 246-47 (3d Cir. 2006)).  Factors which present indications of suspicious behavior include "'behavior that conforms to police officers' specialized knowledge of criminal activity'" and "'furtive hand movements'." *United States v. Hill*, 811 F.App'x 761, 763-764 (3d Cir. 2020) (quoting *United States v. Hester*, 910 F.3d 78, 87 (3d

Cir. 2018) and *United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997)).  In *Hester,* the

Third Circuit explained:

> Among the factors we consider, "[t]he Supreme Court has repeatedly
> recognized that a reasonable suspicion may be the result of any combination
> of one or several factors [including, *inter alia*] specialized knowledge and
> investigative inferences ... [as well as] personal observation of suspicious
> behavior." *United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006) (quoting
> *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002)). Sub-factors that
> indicate suspicious behavior include the suspect's "[p]resence ... in a high crime
> area[,]" "presence on a street at a late hour," and behavior "that conforms to
> police officers' specialized knowledge of criminal activity." *Id*. at 251 (internal
> quotation marks and citations omitted). Although we evaluate each factor "in
> turn," the relevant analysis is whether an officer would have reasonable
> suspicion given the "the whole picture." *Id*. at 247. Thus, even if any factor
> alone would be insufficient to support reasonable suspicion, the relevant
> factors, taken together, could nonetheless suffice.

910 F.3d at 87.

Here, Defendant Wright gave evasive answers to Ference's questions and when

asked his reason for being on the premises delayed a response for 15 to 20 seconds. He

then stated that he had no reason to be on those premises.  A reasonable police officer

would find this interaction indicative of an untruthful response and suspicious behavior.  Nor

did Defendant have identification of any kind to present to Ference upon his request, and

Wright's response to Ference acknowledges this absence.

In addition, Ference observed a cell phone on Defendant's lap which was constantly

ringing.  Yet when Wright said he was going to call his wife, he chose not to use the working

cell phone that was on his lap and instead "began to dig into the folds or the voids in the

seats of the vehicle."  At that point, Ference asked Defendant to stop and exit the vehicle.

When asked why he did so, Ference testified:

> He had a clear working cell phone there to do what he had asked to contact his wife.  Things weren't – his delays in his response, his looking around, et cetera, that led me to believe there was something more.  I didn't know why he was going into the folds of his seat.  So he was asked to step out for my safety and officer's safety.

(*See* Hr'g Tr., at 11:1-25; 12:1-25).  Once Wright exited the vehicle, Ference advised him that he "was under official investigation for reasons of him being there.  He was asked for his identification again, name, date of birth and he reluctantly replied and gave his name, Chay Wright, and date of birth."  (*Id.* at 15:9-15).

Further, Ference properly engaged in a pat down search of Wright during this investigatory stop.  He testified credibly that he did not know why Wright was "going into the folds of the seat", and that he asked Wright to step out of the vehicle "for my safety and officer's safety."  He further described his actions as a "quick pat down for weapons. Nothing more was done there."  Wright's action in "dig[ging] into the folds or the voids in the seats of the vehicle" supported Ference's protective pat down together with the other indicia of reasonable suspicion recounted above.

Ference had a reasonable suspicion that Wright was unlawfully on the property as well.

In *United States v. Moorefield*, the Third Circuit held that the defendant's furtive hand movements and refusal to obey officers' orders provided specific, articulable facts to support the belief that the defendant was armed and thus warranted a pat down search of the

defendant for weapons. 111 F.3d at 14. In particular, as applicable to the case before this

Court, "Moorefield leaned back and appeared to shove something down toward his waist.

Officer Wiles testified that based on his experience, Moorfield's behavior was consistent

with the behavior of a person trying to conceal something." *Id.* The Court then observed:

> Although Officer Wiles testified that he was not sure whether Moorefield was attempting to hide narcotics or a firearm, an "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." [*Terry v. Ohio*, 392 U.S. 1, 27 (1968)]. Moorefield's behavior embodied the kind of specific, articulable facts that *Terry* contemplates and, therefore, warranted a pat-down search for weapons.

*Id*.

Here, Ference was faced with an individual in a vehicle attempting to dig into the

folds of the seats and thus he, like the officer in *Moorefield*, can reasonably be said to have

been concerned that Wright was attempting to hide narcotics or reach a firearm.  Again, as

in *Moorefield*, an officer need not be absolutely certain that the individual is armed.  Rather

the issue is whether a "reasonably prudent man in the circumstances would be warranted in

the belief that his safety or that of others was in danger", *Moorefield,* supra, at 14.  Ference

testified that he engaged in the pat down for his own safety and the safety of the other

officers present.  Thus, he did so in light of the existence of specific, articulable facts which

warranted a pat down search for weapons.

After the pat down search, Wright was not arrested.  Instead, Ference testified that

he sent the information given by Wright regarding his name and date of birth to the 911

center to check for license status and warrants. It was while waiting for that information

from the 911 center that Ference testified that Wright was in front of his vehicle and seemed

"extremely nervous", was "swaying back and forth", and was sweating. Ference then

testified that Wright put his hands in the front pocket of his sweatshirt and pulled his hands

out. (Hr'g Tr., at 15:22-25; 16:1-4.) Ference testified that when Wright did this with his

hands, he noticed there was a "visible baggie that looks like he mistakenly pulled out or got

caught on his hands, and in that clear baggie was visible marijuana." (*Id.* at 16:5-8). It was

at that point that Wright was taken into custody for possession of marijuana and that a

search incident to arrest was conducted which yielded a quantity of crack cocaine.

A review of Defendant's pre-hearing and post-hearing briefs does not point to any

other conduct relating to Defendant's arrest and subsequent search in support of his Motion

to Suppress though he challenges the arrest and search based on his claim of the absence of

reasonable suspicion to support the investigatory stop and pat down. For the reasons set

forth herein, the Court finds that the investigatory stop was supported by reasonable

suspicion and that the pat down search was warranted under the totality of the circumstances

but specifically including the Defendant's conduct in digging into the seats of his car when

asked to exit the vehicle.[5]

_____

[5] Defendant, in his post-hearing brief, makes the statement that he "had brought auto parts to the
shop and was waiting for someone to show up." (Doc. 99, at 2). Defendant cites to pages 83 and 84 of the
transcript. This reference is to the testimony of Juanita Avent, who stated that on the day in question,
Wright "got up to go to take the parts to the mechanic place." (Hr'g Tr., at 83:12-14.) Further, in response
to a leading question, Avent testified:

Q. So you had mentioned that he was leaving or Mr. Wright had left the house and there

23

In sum, based on the testimony presented at the suppression hearing as corroborated by other evidence of record, the totality of circumstances in this case supports the reasonableness of the investigatory stop of Chay Wright. Thus, no Fourth Amendment violation occurred and suppression of the evidence obtained as a result of the stop is not warranted.

For the reasons discussed above, the "Motion to Suppress Seizure of Defendant" (Doc. 76) will be denied.

## B. Motion to Suppress Search of Residence (Doc. 78)

Defendant's next motion to suppress (Doc. 78) requests that the Court "exclude the controlled substances found in the . . . search of [Defendant's] house, and any statements made during the course of the unlawful arrest." (*Id*. at 3).[6]

Defendant argues that Juanita Advent, Wright's girlfriend, "did not voluntarily consent to the search of her and Mr. Wright's home", and thus, in the absence of a warrant to search

---

were some auto parts that he had needed to be put on a vehicle; is that correct?
A. Yes.

Q. So those auto parts that he had left the house with, do you know where they came from?
A. Yes.

Q. Where did they come from?

A. From Harry You Pull It.

(*Id*. at 84:11-19).  Officer Ference's uncontradicted testimony does not contain any reference to any statement by Defendant that he had arrived at the Extreme Auto Works location to take auto parts to "Harry You Pull It".  Instead, Ference testified that Wright informed him that he had no reason for being at the Extreme Auto Works location on October 6, 2015.

[6] Juanita Avent, the individual present during the search of Defendant Wright's house, was not arrested during the search of the home or thereafter.  Thus, Defendant's request that "any statement made during the course of the unlawful arrest" be suppressed appears to be a reference to Defendant's first motion to suppress and has been addressed by this Court in ruling on that motion.

the home, the evidence, including the controlled substances, found within the home must be suppressed. (Doc. 79, at 3-4).  In his motion, Defendant claims that if "law enforcement officers relied upon the consent of Juanita Avent to search the home, the government cannot prove that the officers reasonably relied upon her consent, insofar as: a. Consent must be voluntarily given; [and] b. Third party consent is limited to only those objects over which she would have had common authority."  (Doc. 78, at ¶ 6). Because it is undisputed that there was no search warrant to search Defendant's home, at issue is whether Ms. Avent voluntarily consented to the search of the home and whether that consent was valid as to all areas which were searched and objects which were seized.

Defendant's motion to suppress relates to the search of Juanita Avent and Defendant Chay Wright's home by police officers Mark Stefanowicz and Richard Andress at 51 Rutter Street on October 6, 2015.

Stefanowicz, a full-time narcotics officer for the Hanover Township Police Department, testified that on October 6, 2015, he spoke with Detective Ference around 3 p.m. and was provided information that Ference had a suspect in custody on whom crack cocaine or cocaine had been recovered, and the name and address of this individual.  (Hr'g Tr., at 44, 45).  Stefanowicz confirmed that the individual's address, 51 Rutter Street, Hanover Township, was within his jurisdiction.  (*Id.* at 45).  Stefanowicz testified that he then decided to "go up to the residence to try to make contact with anyone that would be at that residence."  (*Id.* at 46).  Stefanowicz stated that the purpose of going to this address was "to

speak with anyone else that would be at that residence and to see if [sic] the possibility of obtaining consent to search at that address." (Id. at 46). At Stefanowicz's request, Richard Andress, a patrolman with the Hanover Police Department, accompanied him to the home, by separate vehicle. (Id. at 48, 49, 64, 68, 70-71). Andress also testified that the purpose of the visit to the Rutter Street home was to speak with the resident and "ask for consent to search the residence for any further narcotics." (Hr'g Tr., at 70).

On the day in question, Stefanowicz testified that he was dressed in "plain clothes", specifically, jeans and a long sleeve shirt, and that he had his sidearm weapon on him and a neck badge as identification. (Hr'g Tr., at 48). Andress was dressed in the department issued uniform, which included the "full uniform, badge, name tag," firearm, taser, radio, flashlight, and handcuffs, and was "operating a fully marked patrol vehicle." (Id. at 48, 69-70, 79).

When Stefanowicz and Andress first arrived at the home, there was no answer when Stefanowicz knocked on the door. (Id. at 49, 71). Stefanowicz called Officer Ference, who informed him that he had just spoken with a female, provided Stefanowicz with her name, and informed him that she had just left. (Id. at 49). Stefanowicz and Andress waited at the home, and Juanita Avent later arrived. (Id. at 50, 71). Stefanowicz testified that he approached Avent as she was exiting her vehicle and identified himself. (Id. at 50-51). Andress was also with him at that time. (Hr'g. Tr., at 51, 72). Stefanowicz testified that he explained who he was, "informed her of the phone call that [he] received from Wilkes-Barre

City", and asked her whether Chay Wright lived at that address.  (*Id.* at 51-52).  He

described her demeanor as not confrontational and stated that it was "just a normal

conversation."  (*Id.* at 52, 54).  At that time, Stefanowicz stated that he "brought with [him] a

Hanover Township consent to search form, and . . . informed her that [he] would be asking

for her to sign the consent to search form so [he could] remove any property – any evidence

from the residence that would be involved in narcotics trafficking."  (*Id.* at 52) (*see also*,

Gov. Ex. 3 ("Search & Seizure Consent" form, signed by Juanita Avent, Mark Stefanowicz,

Richard Andress)).

Avent similarly testified that a police officer approached her when she arrived at her

home and exited her vehicle and that he asked to speak with her.  (Hr'g Tr., at 92).  Avent

stated that the officer "introduced himself and said his name was officer Stefanowicz from the

Hanover narcotics unit, that he got a phone call from the Wilkes-Barre Police Department,

asked him to come to my house to search my house because my boyfriend was arrested that

morning."  (*Id.* at 93).  However, according to Avent, the officer informed her that "the D.A. is

on his way over with the search warrant to search the house" and that if she left to pick up

her children, the officers would be in the house when she returned and "anybody 18 and

older will go to jail" and that the children would go to "C.P.S."  (*Id.* at 94-95; *see also*, *id.* at

97).  Avent stated that she repeatedly told Stefanowicz that there were no drugs in the home

and that the officers did not need to search the home.  (Hr'g Tr., at 94, 102).

In contrast, Stefanowicz and Andress both testified that no one spoke with Avent

about the District Attorney's Office, Children and Youth Services, or her landlord.  (*Id.* at 61, 76-77).  Andress also testified that no officer indicated to Avent that the District Attorney was involved or that a search warrant was being sought.  (*Id.* at 76).

Stefanowicz testified that, while still outside the house, he filled out the Search & Seizure Consent form with Avent, and he and Andress signed the form as witnesses.  (Hr'g. Tr., at 53, 72-73, 74).  Stefanowicz stated that he presented Avent with the form, allowed her to read the form, which she did, and she then signed it.  (*Id.* at 54)(*see also*, *id.* at 74 (Andress testifying that Avent read the document prior to signing it and did not have any questions)).  Stefanowicz testified that he did not make any threats if she did not sign the document and did not give her "any kind of hypothetical situations if she didn't sign the form" with respect to what could happen to her or her family.  (Hr'g Tr., at 54) (*see also*, *id*. at 77 (Andress testifying that no officer threatened Avent with any type of action to remove her children if she did not cooperate)).  Andress described the conversation with Avent outside as "friendly" and testified that "she wasn't upset or visibly upset at the time".  (*Id.* at 73). After having signed the form, Stefanowicz described Avent as "getting a little bit upset" but attributed this to her statements to him that she had left a "good job" in another state and brought her children to Pennsylvania.  (*Id.* at 54-55).  Avent admitted that she was upset the day that Wright was arrested (*id.* at 101) and confirmed that, while speaking with Stefanowicz in the backyard, she told him "I'm just moving out here, I know I didn't come all the way out here for – to, you know, be in this situation like this, he's not selling drugs, I

don't have drugs in my house" (Hr'g Tr., at 96).

Stefanowicz testified that at this time, he explained to Avent what they were going to do and take from the property and that she did not have questions and "she was not argumentative."  (Hr'g Tr., at 55).

In contrast, Avent testified that she was not given the Search & Seizure Consent form prior to being inside her home.  (*Id.* at 104).  During the suppression hearing, she first stated that she was given the Consent form after the officers took the drugs out of the house.  (*Id.* at 95) (*see also*, Def. Ex. 2, Handwritten statement of Juanita Avent, at 6 (stating that she "signed the paper and they left.")).  However, she later testified that she was given the form after Stefanowicz found "the box" under the bed (Hr'g Tr., at 98, 108) and that, after she signed the form, he continued his search (*id*. at 99).  Avent further testified that she never read the form but signed it because she wanted Stefanowicz "out of [her] house."  (*Id.* at 98-99). She testified that she was "shaking and nervous" and "confused about what was going on and everything."  (*Id.* at 99).  Avent testified that although she can read, she was not able to see the form because she was crying.  (*Id.* at 111-112).

It is undisputed that, following a conversation outside, Avent and the officers entered the house, and that Avent had a key and was in front of Stefanowicz and Andress when entering the home.  (Hr'g Tr., at 56, 97).  It is further undisputed that, once inside, Stefanowicz asked Avent what area Wright would mainly use in the residence and was told it was the upstairs bedroom.  (*Id.* at 53, 56, 97, 105-106).  According to Stefanowicz, Avent

was in front of himself and Andress and escorted the officers upstairs.  (*Id*. at 56).

Stefanowicz stated that Avent did not ask any questions as they went upstairs.  (*Id*.).  Avent

also testified that she led the officers up the stairs, but stated that as she was doing this,

she asked them if they had a search warrant, to which Stefanowicz said something to

Andress which she did not hear.  (*Id*. at 98).  She nonetheless proceeded up the stairs and

into the bedroom with the officers.  (*Id*.).

 Once in the bedroom, Stefanowicz conducted a search.  (Hr'g Tr., at 57, 98).

Stefanowicz testified that they entered the bedroom and Avent "went down and reached

underneath the bed and brought out a shoe box . . . and put it on the bed."  (*Id*. at 57)(*see

also*, *id*. at 74, 75 (Andress stating that Avent "guided us to the upstairs bedroom" and that

she "opened or reached underneath the bed to grab a box.")).  Stefanowicz testified that he

found "suspected" MDMA and drug paraphernalia in that box.  (*Id*. at 58).  He found another

box under the bed which contained suspected crack cocaine, MDMA, and drug

paraphernalia.  (*Id*.).  In a dresser, he found a large bag containing rice and suspected

heroin packets.  (*Id*.).  He also pulled out a square box, with no key, from the dresser.  (*Id*.

at 59).  He was told by Avent that it was Chay Wright's box and not hers.  (Hr'g Tr., at 59,

66).  Stefanowicz opened the locked box but could not remember how he did so.  (*Id*. at 66-

67).  Stefanowicz also recovered a "tin container that contained currency" under the

mattress.  (*Id*. at 59).  After finishing the search of the bedroom, Stefanowicz and Andress

left the home.  (*Id*. at 60)(*see also*, *id*.at 99 (Avent confirming that the police officers left after

searching the bedroom)).

Stefanowicz explained that, unlike a search pursuant to a search warrant, "on a consent to search, the person is always going to be there . . . so they can withdraw consent if they need to."  (Hr'g Tr., at 57).  Stefanowicz testified that at no time during his search of the bedroom did Avent tell him to stop or withdraw her consent, and that Avent never asked him any questions with respect to whether or not she should consent or withdraw consent. (*Id.* at 59, 61).  Avent did not offer any testimony to the contrary.

In sum, upon review of the testimony and exhibits admitted into evidence during the hearing, the following facts are undisputed: (1) Officers Stefanowicz and Andress met Avent outside her home on October 6, 2015; (2) Avent unlocked a door to the house and the Officers entered into the home behind her; (3) Avent never told the police officers that they could not come in to her home and at no time when they were inside the house did she tell them to leave; (4) inside the house, Avent informed the Officers that Wright spent most of his time in the bedroom; (5) Avent led the police officers upstairs to the bedroom; (6) in the bedroom, Stefanowicz found drugs, money, and drug paraphernalia; (7) the Officers left after searching the bedroom and did not search any other part of the home; (8) at some time prior to the Officers' departure, Avent signed a Search & Seizure Consent form.

"Consent is an exception to the 'requirements of both a warrant and probable cause.'"  *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically

established exceptions to the requirements of both a warrant and probable cause is

a search that is conducted pursuant to consent.")).  Consensual searches do not violate the

Fourth Amendment "because it is no doubt reasonable for the police to conduct a search

once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250-251 (1991).

"Consent must be voluntary, may be express or implied, and need not be knowing or

intelligent."  *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005); *see also*

*Schneckloth*, 412 U.S. at 235-236 (holding that consent to a search need not be knowing or

intelligent). When making a determination about the voluntariness of consent, courts are to

consider "the totality of the circumstances," including such factors as: "the age, education,

and intelligence of the subject; whether the subject was advised of his or her constitutional

rights; the length of the encounter; the repetition or duration of the questioning; and the use

of physical punishment." *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009).  *See also*,

*United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994) ("Whether a consent to a search was

in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question

of fact to be determined from the totality of all the circumstances.  Thus whether consent

was given is to be resolved by examining all relevant factors, without giving dispositive

effect to any single criterion.") (internal citations and quotation marks omitted).  In addition,

the "setting in which the consent was obtained [and] the parties' verbal and non-verbal

actions are also relevant" and the Government need not inform the subject of his or her right

to refuse consent.  *Stabile*, 633 F.3d at 231 (internal citations and quotation marks omitted).

> The individual giving consent must also possess the authority to do so, and the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared. Common authority rests not on property rights but rather on mutual use of the property by persons generally having joint access or control ... so that it is reasonable to recognize that any of the cohabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id*. at 230-231 (internal citations and quotation marks omitted).

"The government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent." *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989).

Here, it is undisputed that Avent lived in the properly at 51 Rutter Street and had the authority to give consent to a search of the house. Thus, with the exception of the locked box located in the bedroom to which she did not have a key (which will be addressed *supra*), the issue is only whether Avent gave voluntary consent to the officers to search the home and, more specifically, the bedroom.

The Court therefore turns to the factors which may be examined when considering the "totality of the circumstances" about whether the consent was voluntary. Avent, an adult, testified that she could read and worked as a home health aide at Sweet Home Primary Healthcare. (Hr'g Tr., at 83, 111). During her testimony, it was evident that Avent could speak clearly and in a reasoned fashion, and understood the questions being asked of her and was appropriately responsive. Thus, the "age, education, and intelligence" of Avent demonstrate that she was capable of understanding the events of October 6, 2015

and was capable of voluntarily consenting to the search.

Nor does Defendant, in his brief in support of the motion, argue that the repetition or duration of the encounter with the officers was excessive or somehow affected the voluntariness of any consent. Rather, Defendant's entire argument is premised on an assertion that Avent was "pressured" due to references to children and youth services and being arrested and that she was told the D.A.'s office had, or would have, a search warrant. (*See* Doc. 79, at 2-3).[7]

Despite Defendant's argument, the testimony of record does not support a finding that Avent did not voluntarily consent to the search of the home or that her consent was the result of coercion or duress.

Preliminarily, the Court notes that Stefanowicz and Andress each provided credible, clear, and coherent testimony. Both police officers presented consistent testimony and the Officers' accounts of the events at issue did not change at any time during the proceedings. In comparing the testimony of Stefanowicz and Andress with that of Avent, it is clear that the basic sequence of events, and what occurred prior to, and during, the search of the home, are very similar. It is equally clear that Avent was informed of the Officers' purpose for being at the house and requesting to search the home, and that she was not mislead as to

---

[7] Defendant's brief in support of this motion to suppress is 5-pages, provides factual statements in summary fashion and offers only broad statements of the basic applicable law. The brief provides minimal analysis and fails to set forth with any specificity the bases for Defendant's motion. (*See* Doc. 79). In addition, although Defendant was permitted to file a post-hearing brief, he limited this brief only to his other motion to suppress. The Court is thus largely tasked with piecing together Defendant's most likely arguments, without any aid by Defendant's counsel.

what the Officers were seeking. (*Compare*, *e.g.*, Hr'g Tr., at 52 (Stefanowicz testifying that

he "informed [Avent] that [he] would be asking for her to sign the consent to search form so

[he could] remove any property – any evidence from the residence that would be involved in

narcotics trafficking") *with id.* at 93, 94 (Avent testifying that the officer "introduced himself

and said his name was officer Stefanowicz from the Hanover narcotics unit, that he got a

phone call from the Wilkes-Barre Police Department, asked him to come to my house to

search my house because my boyfriend was arrested that morning" and that she told

Stefanowicz that there were no drugs in the home)). *See e.g.*, *Kim*, 27 F.3d at 955 (finding

indicia of voluntary consent where "[d]uring the entire period, [Agent] Small mentioned only

that he was looking for illegal drugs. That was not a probing or incriminating question; it was

meant to inform [Defendant] Kim of Small's mission and the scope of his search so as not to

mislead Kim."). Rather, the most prominent factual differences in the testimony of the

Officers and Avent relate to (1) whether Avent was "pressured" by Stefanowicz to allow the

officers in to the home, and (2) when the Search & Seizure consent form was signed by

Avent.

In making these determinations, the Court affords Avent's testimony of the events of

October 6, 2015, little credibility. Avent testified that she moved to Rutter Street in Hanover

Township from Virginia approximately three months prior to the incident at issue in October

of 2015 and has known Defendant Wright for "over 20 years". (Hr'g Tr., at 81-82). Advent

admitted that she knew Wright had previously been in trouble for selling drugs. (Hr'g Tr., at

101).  However, despite knowing Wright for an extended period of time and being aware of

his drug history, Avent testified several times that she did not believe that there were any

drugs in the home.  (Hr'g Tr., at 94, 102).  But after the officers entered her home, it is

undisputed that she was able to immediately direct them to the bedroom, where drugs and

drug paraphernalia were located in several locations throughout the room, all of which she

had access to, including under the couple's bed.  Avent's statements that she did not know

there were drugs in the home, despite the presence of drugs in several locations in the

common areas of their own bedroom where the drugs were readily accessible to her, as

well as her intimate knowledge of Wright and his criminal history involving drugs, are not

believable and taint her other testimony provided during the suppression hearing.

 In addition, Avent's assertion that she did not voluntarily let the officers into her home

lacks veracity. As previously set forth, Avent and the officers engaged in a conversation

outside the home prior to entering.  Avent testified that she could not find her keys as she

was attempting to enter the house, and that she was just going to leave to pick up her

children.  (Hr'g Tr., at 96).  Instead, when Stefanowicz told her that her keys were in the car,

she retrieved them and went back to the house.  (Id.).  She attempted to enter through the

rear door but complied when Stefanowicz told her that they needed to enter through the

front door.  (Id.).  Avent did not testify that she was prevented from leaving her property in

her car or was forced to retrieve her keys from the car and return to the home.  Thus,

despite having the opportunity to freely leave, Avent went to her car, got her keys, returned

to the home, and, at the officer's request, went to the front of the home to open the door.

Avent testified that the officers "follow[ed [her] in" the house but admitted that she never told

them that they could not come in, did not say "stop", and did not tell them to leave. While

Avent was opening the front door, she admitted that Stefanowicz held the screen door open

for her, which she let him do and she did not tell him to stop holding the door, to get off the

property, to leave, or that she wanted to wait for the D.A. or for a search warrant. (Hr'g Tr.,

at 103, 105, 106). This series of events weighs in favor of a finding that Avent voluntarily

consented to the officers entering her home. Once inside the home, Avent told the police

officers where Wright spent most of his time, voluntarily led them upstairs to the bedroom,

and at no time did she tell them to leave, that they could not search the room, to stop

searching the room, or to leave the home. This series of "non-verbal actions", as well as the

fact that they occurred on Avent's property and within Avent's own home, are "relevant" in

determining consent, *Stabile*, 633 F.3d at 231, and, when looked at as a whole, indicate that

Avent voluntarily consented to the search.

With respect to Avent's suggestion that she was misled by the police officers about

the D.A.'s office issuance of a search warrant, this claim does not support a finding that the

asserted presence of a search warrant affected her decision to allow the officers into her

home or to voluntarily consent to a search. First, Avent specifically responded "No" when

asked whether she "allowed the officers to come into [her] house because [she] thought a

warrant was coming", explaining only that she "didn't allow him to come into my house" but

that "he walked into my house." (Hr'g Tr., at 104).  Nonetheless, Avent later testified that

she "should have" waited for a search warrant before taking the officers up the stairs in the

house, but that Stefanowicz had told her that "if the search warrant get here before – the

D.A. get here before the – with the search warrant and we don't search your house,

anybody 18 and older is going to jail and that [she would] get locked up and [her] kids [are]

going to C.P.S." (*Id.* at 106; *see also*, *id.* at 97).  But Avent later twice stated that "[w]ho's to

say [she] wasn't waiting [for the warrant] in [her] house" (*id.* at 108).  Despite these

statements, her actions of informing the Officers where Wright spent most of his time in their

home, and taking the officers directly to the couple's bedroom, all indicate that she was not

waiting for a search warrant.  Avent also admitted that she did not tell the officers that she

wanted to wait outside until the D.A. arrived with the search warrant.  (*Id.* at 103).

Nor is Avent's claim that she believed that if she waited for a search warrant, her

children may be taken away or she would be jailed credible. Avent repeatedly testified that

she did not believe that there were any drugs in the home.  (*See* Hr'g Tr., at 94, 102).

Avent's testimony is inconsistent where she claims that she was confident there were no

drugs in the house but suggests that she was afraid of being arrested if drugs were found in

the house.  It is also inconsistent to the extent she is saying that she did not consent to the

officers entering her house, while also asserting that she consented to them coming into,

and remaining in, her house because she was afraid of being arrested and her children

being taken away.

Finally, Avent testified that as she was leading the officers up the stairs to the

bedroom, she asked them if they had a search warrant, to which Stefanowicz said

something to Andress which she did not hear. (Hr'g Tr., at 98). Despite the fact that the

officers apparently did not respond to her purported question, and she did not hear what

was said between them, she continued up the stairs and into the bedroom. This lack of

interest in a response from the Officers indicates that the presence of a search warrant, or

lack thereof, was not an important factor in Avent's decision to allow the police officers into

her home and to show them the bedroom and that, assuming a search warrant was even

mentioned by her or Stefanowicz, it did not affect the voluntariness of her consent.

Thus, Avent's testimony clearly demonstrates that she did not rely on the possibility

of a search warrant in determining whether the officers could enter the house and search

the bedroom.

Avent's assertion that Stefanowicz threatened her by stating that her children would

be taken from her is also contradicted by the record testimony. Avent testified that

Stefanowicz told her the children would go to "C.P.S." (Hr'g Tr., at 112). However,

Stefanowicz credibly testified that in Luzerne County, the service is called Children and

Youth Services, abbreviated as "C.Y.S.", and that he only uses the "full words" "Children

and Youth", never the abbreviation "C.Y.S." and that he "never" uses "C.P.S." as that is not

the name of the program. (*Id*. at 126). Nor can this Court assume that Avent simply

misspoke in stating the name of the children's service where she testified that she knew

Children and Youth Services as "DYFS" and not as "C.P.S." and that she "didn't know about C.P.S. until [Stefanowicz] said C.P.S." (*Id.* at 112).

Further, the Court notes although both officers admitted to having weapons, there is no testimony to suggest that Avent was threatened with the use of force, afraid that force would be used against her, or was intimidated by the presence of the weapons. Avent admitted that when the officers entered her home, they did not have their guns or tasers drawn and did not push her (Hr'g Tr., at 105), and there is no testimony that any physical force or physical threats were used at any time prior to, or during, the search. Thus, there is no concern that the use, of threat of use, of force in any way affected the voluntariness of Avent's consent.

Avent's testimony that she did not read "a word" of the Search & Seizure Consent form is also not credible. (*See* Hr'g Tr., at 110-112). Avent not only stated that she did not read the form, but that she was not able to even see the title of the document ("Search & Seizure Consent") because she was crying, despite this title being written in bold, all capital letters, in large font near the top of the page. (*Id.*; *see* Gov. Ex. 3). Despite an asserted inability to see these words, Avent nonetheless signed the document in the correct place in the middle of the page, and her signature is straight and directly on the signature line. The word "signature" above which Avent signed is significantly smaller than the title words of the document. Avent would not have been able to get close enough to the document to clearly and legibly sign the form, but not see the title of the form she was signing and, arguably, at

least some of the text contained therein. In sum, it is evident that Avent knew what she was signing.[8]

For the aforementioned reasons, upon consideration of the totality of the circumstances in making a determination about the voluntariness of Avent's consent to the search of 51 Rutter Street, the Court finds that the Government has sustained its burden of establishing by a preponderance of the evidence that Avent consented to the search of her home, and in particular the search of the bedroom, and that this consent was voluntary and not the product of duress or coercion.

Nonetheless, although this Court has determined that consent was voluntarily given to search the home, and thus the Court will not exclude all of the controlled substances, drug paraphernalia, cash, and any other items seized in the bedroom, the Court will suppress any items contained within the locked box found in the bedroom.

The Third Circuit has made clear that:

a third party lacks authority to consent to a search of an area in which the target of the search has not "relinquished his privacy." *United States v. King,* 604 F.3d 125, 137 (3d Cir.2010); *see United States v. Block,* 590 F.2d 535 (4th Cir.1978) (holding that mother had authority to consent to search of son's bedroom but not to son's locked footlocker kept under his bed); [*Georgia v.*] *Randolph,* 547 U.S. [103, 135 (2006)](Roberts, C.J., dissenting) ("To the extent a person wants to ensure that his possessions will be subject to a consent search only due to his *own* consent, he is free to place these items in an area over which others

_____

[8] Avent's testimony as to when she received the Search & Seizure Consent form further undermines her assertions. First during the suppression hearing, as well as in Avent's handwritten statement, Avent stated that she was given the Consent form after the officers took the drugs out of the house. (Hr'g Tr., at 95; Def. Ex. 2, at 6). However, she later testified at the hearing that she was given the form after Stefanowicz found "the box" under the bed (Hr'g Tr., at 98, 108) and that, after she signed the form, he continued his search (*id*. at 99).

do *not* share access and control, be it in a private room or a locked suitcase under a bed."). Thus if a person has not "relinquished his privacy" . . . , a third party would have no authority to consent to the search or seizure of those segregated materials.

*Stabile*, 633 F.3d at 232.

Here, although all other items were within the joint access and control of Avent and Wright, and Avent had access to those items, the record unequivocally shows that the locked box belonged solely to Wright, Avent did not have a key to the box or access to its contents, and that despite informing Stefanowicz that it was not hers and that she could not open it, he broke the lock and retrieved the contents. The Court further notes that the Government appears to concede that Avent could not consent to a search of the locked box. In its brief in opposition to Defendant's motion, the Government argues that "[*w*]*ith the possible exception of the locked small metal box* containing cash, each of the other items were both stored in an area to which Avent had common access; and in such condition as to afford joint control." (Doc. 88, at 12)(emphasis added). The Government additionally asserts that Avent's authority to grant consent to search the bedroom extended to areas "within the shared bedroom unless Wright secured the areas or containers" which he did "only with respect to the small *locked* metal box containing cash found in the dresser drawer. . ." and states that the "remaining cash and contraband seized by investigators was done so pursuant to legal authority granted by Avent's voluntary waiver of consent to search the residence." (*Id*. at 14) (italics in original, underline added). Thus, because Avent did not have the authority to consent to Stefanowicz's search of the locked box as Wright had not,

42

in any way, "relinquished his privacy" in the contents therein, Defendant's motion to suppress the items found within the locked box will be granted.

For the foregoing reasons, Defendant's "Motion to Suppress Search of Residence" (Doc. 78) will be granted in part and denied in part as set forth herein.

### III. CONCLUSION

For the reasons set forth herein, Defendant's Motion to Suppress Seizure of Defendant (Doc. 76) will be denied and Defendant's Motion to Suppress Search of Residence (Doc. 78) will be granted in part and denied in part.  A separate Order follows.

Robert D. Mariani
United States District Judge